**ARNOLD PIPE RENTALS COMPANY, Inc., Appellant,**

v.

**ENGINEERING ENTERPRISES, INC., Appellee.**

No. 21720.

United States Court of Appeals Fifth Circuit.

July 16, 1965.

On Petition to Reopen Decision Aug. 24, 1965.

George C. Helmig, Houston, Tex., Edward A. Haight, Chicago, Ill., Andrews, Kurth, Campbell & Jones, Houston, Tex., Haight, Simmons & Hofeldt, Chicago, Ill., for appellant.

James B. Simms, W. H. Skipwith, Jr., Marvin B. Eickenroht, Browning, Simms, Hyer & Eickenroht, Houston, Tex., for appellee.

Before BROWN and GEWIN, Circuit Judges, and KILKENNY,* District Judge.

GEWIN, Circuit Judge:

In this patent infringement suit, the district court held the claims in issue valid and infringed, and the alleged infringer appeals. We affirm the district court on both issues.

The claims of the patent in suit[1] teach the construction of a drill collar used in rotary bit drilling of oil and gas wells. Each collar has a plurality of spiral grooves around its outside surface. The presence of this shallow groove, which is described as "at least substantially flat," serves to reduce the likelihood of "pressure differential sticking," a phenomenon which has caused much expense and delay in the drilling of deep wells, particularly along the Southern Gulf Coast.

In rotary bit drilling, the rock bit itself is connected to the derrick by the drill string, which is composed of numerous sections of drill pipe. The outside diameter of this pipe is smaller than the diameter of the well bore. A number of oversize lengths of pipe, known as drill collars, are placed immediately above the bit itself. These collars are about 30 feet in length, and normally about 15 collars are employed in a drill string. Their function is to impart maximum weight and rigidity to the drill string just above the bit, thus aiding the bit in cutting through the formation and minimizing the likelihood that the hole will deviate from straight. As the drill

---

* Of the District of Oregon, sitting by designation.

1. Claims 2, 4, and 5 of U. S. Letters Patent 2,999,552 are in issue. Plaintiff Engineering Enterprises, Inc., has owned the entire right and interest in the patent since its issuance on September 12, 1961, upon the application of Fred K. Fox.

string and bit are rotated, a colloidal drilling mud is circulated under pressure down through the center of the drill string, around the bit itself, and back up to the surface through the annular space between the outside of the drill string and the wall of the bore. This mud serves to cool and lubricate the bit, to clean the cuttings from the bottom of the hole, and to reduce the danger of a blowout by providing a pressure greater than that of the porous formations which have been penetrated. As the mud is circulated back up through the annular space between the drill string and the wall of the bore, its liquid constituents tend to invade porous formations. This occurrence can cause damage to potentially productive formations which are being by-passed and can upset the chemical balance of the mud itself. Therefore, the mud contains certain constituents which form a tough filter cake on the wall of the bore which seals off the formation, preventing further migration of the fluids in the drilling mud. This mud coating quite often attains a thickness of ¾ inch.

Often in deep wells formations are encountered in which the pressure is less than the pressure in the column of drilling mud. Because drillers have never learned to drill a perfectly straight hole, a portion of the drill string will lie against the wall of the bore, even while the string is being rotated. When drilling stops, as it often must, in a deep formation which has a lower pressure than that of the column of mud, the phenomenon known as pressure differential sticking can occur. If the mud filter cake has not yet fully formed or has been totally or partially cut away by rotation of the collar, the very high hydrostatic pressure of the mud column will force the drill string tight against the low-pressure formation. Once this "wall sticking" occurs, it is difficult—indeed, it is often impossible—to free the stuck section of the drill string. Procedures to free the drill string are unusually expensive. The problem is complicated by the formation of a fillet of filter cake on each side of the stuck area which acts as a pressure seal, thus increasing the sticking force. The pressure differential is often tremendous at depths of over 10,000 feet, and it increases proportionately with the area of drill collar which comes into contact with the wall of the bore. In some instances, it has been necessary to plug or abandon wells in which wall sticking has occurred.

Although the problem of wall sticking has existed in the oil and gas industry for many years, recognition of its cause has been relatively recent. The trial court found that during the period 1950–1959 the drilling industry had become increasingly aware of its genesis and had resorted to several experiments to alleviate it. Apparently, some experts began to realize the causes of wall sticking soon after the Second World War. Several courses of action were indicated to counteract its deleterious effects, in addition to keeping the drill string moving to equalize the pressure and altering the composition of the drilling mud. One was to reduce the pressure differential by lowering the pressure of the column of mud. However, this was often impractical for obvious reasons. A second approach which was widely adopted was to attempt to center the drill string in the hole by means of stabilizers. These are short lengths of pipe having lands, or blades, with almost the same gauge as the hole itself. Stabilizers proved unworkable for at least two reasons. The lands on the stabilizers produced a reaming effect which tended to cut away the filter cake and enlarge the size of the bore itself. When the blades of these devices dug into a soft formation to a depth greater than the width of the blades, the stabilizers tended to defeat their own purpose by permitting the outside surface of the drill collar or pipe to contact the wall of the bore anyway. In addition, stabilizers had a tendency to ball up with shale, increasing the danger of a blowout.

The device described in the Fox patent seeks to combat the problem of pressure differential sticking by decreasing

the area of the drill collar which contacts the wall of the hole without reducing the effectiveness of the drill collar itself. Fox's approach is to permit the collar to lie against the wall of the bore, but to reduce the area which comes into direct contact with the low-pressure formation. This is done by placing very shallow spiral grooves around the outside surface of the collar. Claim 2 of the patent in suit, on which claims 4 and 5 depend, describes the grooves as follows:

> "2. An integral, elongate tubular member having means at its opposite ends for connection in a drill string and at least one helical groove in its outer peripheral surface, which has a base forming, in any section transversely of said member, a line which is at least substantially flat and intersects at its opposite ends with said peripheral surface."

These very shallow grooves, shown in the preferred embodiment drawings of the patent application as having a flat or slightly convex base, maintain the effectiveness of the drill collar because there is very little decrease in the weight or rigidity of the collar. Furthermore, because of the shallowness of the grooves, rotation of the collars does not produce the reaming or cutting effect experienced in the use of stabilizers. A cutting edge, of course, would tend to scrape the filter cake from the wall of the hole, thus contributing to rather than reducing the likelihood that the collar will become stuck. The record revals that the Fox collars have enjoyed considerable commercial success, commanding a premium rental over ordinary collars.

The collars which are alleged to infringe Claims 2, 4 and 5 of the Fox patent are made for defendant Arnold by various manufacturers of oilfield equipment. Arnold in turn rents these collars to drillers for use in drilling operations. The Arnold collars are substantially identical to those manufactured by Fox[2] except that they have a groove whose base

in a transverse section is very slightly concave. Since the concavity is insubstantial, the collars achieve the same effects as the Fox collars without producing either a cutting edge or reducing the weight and rigidity of the colllar to an unsatisfactory degree.

■ Initially, Arnold challenges the district court's express finding that the device in question was not anticipated by the prior art and the implicit conclusion that it constituted an invention. After a careful consideration of the entire record, we cannot say that the district court's holding of validity was erroneous.

We think it clear that the Fox patent was not anticipated by the prior art. Anticipation, of course, is largely a question of fact and is thus subject to the strictures of Rule 52(a), F.R.Civ.P., on review. Inglett & Co. v. Everglades Fertilizer Co. (5 Cir. 1958) 255 F.2d 342, 345. Undoubtedly, drill collars and drill pipe with spiral grooves about their outer periphery are old in the deep drilling art. However, most of the prior art references in the record are to devices which were developed long before the problem of pressure differential sticking was understood, and none are directed to a solution of that problem. These devices are unsuitable for effectively alleviating wall sticking. Most of them have cutting edges which would produce the undesirable reaming and broaching effects which Fox sought to avoid. The only prior art without a cutting edge is the Boice patent, which has one shallow circumferential groove around each end of the drill string member. This device would not reduce the area of contact with the wall enough to minimize the sticking problem appreciably. It was addressed to reducing the concentration of stresses near the threaded joints of the sections of drill pipe. Furthermore, it is of some significance that the Patent Office considered the most relevant prior art and allowed the claims in suit over the de-

---

**2.** The Arnold collars have four grooves to Fox's three. It appears to be conceded that this minor variation has no bearing on the issue of infringement.

vices disclosed by that art. It is thus apparent that the prior art did not contain a device which was of substantially the same design as the Fox patent and which produced the same results.

Arnold contends further that the Fox device is merely a combination of old elements which produces no new and unobvious result. It is clear from a reading of the record that the district court considered this question and concluded otherwise. Although we are mindful of the pitfalls of the combination patent, see Great Atl. & Pac. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950), we agree with the district court's conclusion that the Fox device was the product of invention.

■ The resolution of the question of invention requires application of the correct legal criteria to the facts found by the trial court. See, e. g., Great Atl. & Pac. Tea Co. v. Supermarket Equip. Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950); Houston Oil Field Material Co. v. Claypool (5 Cir. 1959) 269 F.2d 134; Armour & Co. v. Wilson & Co. (7 Cir. 1960) 274 F.2d 143, 151–157. We have considered the district court's findings of fact on this issue and conclude that they are fully supported by the record. Hence, our only duty is to assure ourselves that the patent in suit meets the requisite standard for invention; i. e., that it would not "have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. * * *" 35 U.S.C.A. § 103.

In a sense reduction of the area of contact with the formation may have been an obvious means of combatting the problem of pressure differential sticking, and it is conceded that one skilled in mechanics could have eliminated an undesired cutting edge from a drill collar. Fox did not exercise inventive genius when he eliminated the reaming effect from grooved collars. What was not obvious was that a drill collar could be designed at all which would alleviate the wall sticking problem in such a manner

while retaining maximum weight and rigidity in the collar itself. Fox's approach of allowing collars with extremely shallow grooves to lie against the wall of the hole was the inventive aspect of the claims in suit. The record indicates that it was not generally thought that the shallow grooves which were necessary in order to maintain the effectiveness of the collar and eliminate cutting edges would have been successful in reducing the likelihood of sticking. It must be borne in mind that these grooves are not nearly so deep as the thickness of the filter cake which forms on the wall of the bore. The testimony indicates that the industry generally believed that such reliefs would not reduce the tendency to stick since they would become plastered with mud and would not really keep the grooved area out of contact with the formation. One witness testified:

"Q. Now, at Page 64, I believe, of this article, there is a statement in the left-hand column, the second complete paragraph:

'Obviously, then, there are two ways to cut down on wall-sticking: (1) Reduce the area of contact, and (2) keep mud pressure as near formation pressure as practical.'

Do you agree that that is obvious?

"A. I agree that those would be two good ways of doing it, yes.

"Q. And that it would be obvious as soon as you became aware of pressure differential sticking?

"A. No, I wouldn't think so, no. I would think that if you kept it away either way, that that would be obvious, but I wouldn't see the obviousness of these shallow grooves. It wouldn't seem to me that these quarter-inch, these $\frac{3}{16}$ inch things we are talking about, where that drill collar is up against the side of the wall, it would be so plastered with mud it wouldn't make any difference, now, as far as keeping the area of contact well away, which is done with stabilizers, I can see that;

it is just as obvious as anything to me. Two things can't stick together if they are not touching."

Actually, the Fox device works despite the shallowness of the groove because only the two ends of the groove in a transverse section come into full contact with the wall itself, allowing the pressure of the mud cake to exert an upward force on the grooved area itself so that it is substantially in hydrostatic balance at mud pressure.

Moreover, the Fox design enjoyed considerable commercial success once the industry became convinced it was a workable solution to the problem of pressure differential sticking. Many drillers now use spirally-grooved drill collars to the exclusion of all other types, at least in areas where deep drilling is commonplace. We think the unobviousness of Fox's solution to the problem is further supported by the fact that the industry did not immediately resort to shallow grooves once pressure differential sticking was understood, even though the prior art was crowded with suggestive devices. This court cautioned against the use of hindsight in evaluating the question of obviousness in Duo-Flex Corp. v. Building Serv. Co. (5 Cir. 1963) 322 F.2d 94, 96–97:

> "It appears to us that the thrust of the argument that the subject matter of Stanley is obvious is based primarily on hindsight. * * * Here, as in Diamond Rubber Co. of N. Y. v. Consolidated Rubber Tire Co., 1911, 220 U.S. 428, 435, 31 S.Ct. 444, 447, 55 L.Ed. 527, it may be said that:
>
> > 'Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skillful attention. * *' "

In addition, the presumption of validity as strengthened by the fact that the Patent Office considered the most pertinent prior art in allowing the claims in suit reinforces our conclusion that the Fox patent is the exercise of invention. Furthermore, there is some evidence in the record that the Fox device had to be demonstrated to drillers to convince them that it was a workable solution to the problem. In all the above circumstances, we hold that Claims 2, 4, and 5 of the Fox patent are valid.

Arnold contends that, even if the question of validity is resolved against it, the district court erroneously concluded that its collars infringed the Fox patent. It argues (a) that the Fox patent discloses only grooves whose base is flat or slightly convex, and (b) that in any event the patentee is estopped by his conduct in the Patent Office proceedings from asserting that the patent covers a groove the base of which is slightly concave. The district court concluded otherwise, and we agree.

The question of infringement, both parties assert, turns solely on the construction of the phrase "at least substantially flat" in the description of the groove formation in Claim 2. Arnold points to certain language in the file wrapper and in the patent description which clearly indicates that Fox was thinking primarily about a groove which was flat or slightly convex.[3] The Patent

---

3. For example, in discussing the preferred embodiment drawings of the patent, Fox stated:

"As shown and as previously discussed, these grooves are preferably formed by flat surfaces which may be machined on a conventional drill collar as it is turned on a mandrel. Normally, bevels would be formed at each end of the grooves as shown in FIGS. 3 and 4. This eliminates any sharp corners which might otherwise mill out the mud lining in the well bore. If desired, however, the grooves may be slightly convex, as shown at 26 in FIG. 5, without the danger of any substantial damage to the well bore.

"In either case, the groove has a base which forms, in any section transversely of the axis of the collar (as shown

Office proceedings were rather extended because of the necessity of narrowing the groove description in light of the prior art patents. Arnold emphasizes that Fox never specifically asserted in the Patent Office proceedings that the grooves of his collars could be very slightly concave until after he had inspected some of the drill collars manufactured for Arnold.[4] It is thus urged that, pursuant to the doctrine announced in Chicago & Nw. Ry. v. Sayles, 97 U.S. 554, 563, 24 L.Ed. 1053 (1878), and followed in Schriber-Schroth Co. v. Cleveland Trust Co., 311 U.S. 211, 61 S.Ct. 235, 85 L.Ed. 132 (1940), Fox is estopped from attempting to enlarge his claim to embrace an invention not described in the original application.

■ While the question of the construction of the claim involved is a very close one, we choose to align ourselves with the district judge on this issue. Although the preferred embodiments clearly comprehend only a flat or slightly convex groove, the construction of a patent claim is undoubtedly not limited to what is disclosed in the preferred embodiment drawings. See Edward Valves, Inc. v. Cameron Iron Works, Inc. (5 Cir. 1961) 286 F.2d 933, 942. Nowhere in the file wrapper can we find an assertion by the applicant that the patent disclaimed a groove of such slight concavity that it would not produce a cutting edge. Naturally a flat or convex groove was preferred, because such a design sacrificed a minimum of the weight and rigidity so necessary to the effective functioning of the collar. It is true that the applicant did assert in response to the Examiner's query that the word "con-

vex" is his preferred embodiment description and should not be changed to "concave," but he also stated in the same answer that he was employing the term "groove" in the patent to refer to "a surface—whether flat, convex *or concave* —with respect to the outer peripheral surface of the collar." (Emphasis added.) It should be noted that this latter assertion was made prior to the time Fox had examined the collars manufactured for Arnold. In fact, much of the language relied on by Arnold to support its contention that Fox renounced slightly concave grooves until he became aware of the Arnold devices is really directed to the Examiner's misunderstanding of the applicant's use of the word "groove" to include a relief with a flat or convex base, and it must be read in that context.

■ Finally, we deem it very significant that Claim 1, which is not in controversy, described in plain language a groove with a flat or convex surface. If the language "at least substantially flat" in Claim 2 is to be afforded any independent meaning it must be construed to include a groove with a base which is flat, very slightly convex, or very slightly concave. We do not find any substantial indication in the file wrapper that Fox attempted a tardy broadening of its claims. See Tubular Service & Engineering Co. v. Sun Oil Co. (5 Cir. 1955) 220 F.2d 27. While the prior art required some narrowing of the groove description just as it did of the description of the rock bit in Hughes Tool Co. v. Varel Mfg. Co. (5 Cir. 1964) 336 F.2d 61, the prior art here did not restrict the patentee as closely as it did there. Also, in Hughes Tool we deemed ourselves bound

in FIGS. 4 and 5), a smooth continuous line which intersects the peripheral surface of the collar at circumferentially spaced-apart points, all points on such line being spaced from the axis of the collar a radial distance at least as great as the radial distance from said axis of a chord connecting the intersecting points."
As a matter of simple geometry, the latter paragraph can refer only to a groove with a flat or convex base.

4. In the explanation of certain amendments filed on June 7, 1961, Fox stated: " * * * In the first place, inasmuch as the grooves in applicant's tubular member are flat, convex, or only very slightly concave, they provide a maximum area thereabout which is held out of contact with the well bore, with only a minimum weight loss as well as only a minimum reduction in wall thickness."

in part by the trial court's substantiated findings of fact as we deem ourselves bound in this case. Except for the unsuccessful attempt to claim collars with circumferential grooves, the patent sought to claim substantially the same device throughout the proceedings before the Patent Office.

Arnold urges, however, that if we accept the district court's construction of the patent as including a groove whose base line in a transverse section is slightly concave, the patent description does not pass muster under 35 U.S.C.A. § 112 and should be held invalid for indefiniteness. It is urged that a broad interpretation of Claim 2 does not apprise the public of the breadth of the patentee's alleged invention, but instead makes delineation of the line between his monopoly and the public domain a matter of guesswork. Particular attention is directed to testimony in the record that the limits of the claim could only be determined by testing the performance of the product in a particular formation, since effective functioning of the collars depends on so many variables, such as the size of the drill collar, the type of formation, and the condition of the drilling mud. Hence, the description in the Fox patent is similar to that disapproved by the Supreme Court in United Carbon Co. v. Binney & Smith, 317 U.S. 228, 63 S.Ct. 165, 87 L.Ed. 232 (1942), where a patent on a method of storing fluffy carbon black which defined the resulting aggregate of carbon black only as having a "spongy and porous interior" was held indefinite.

■■ Although we regard Arnold's objection as a forceful one, we think the phrase in controversy is not fatally indefinite. In our opinion the patent claim in the instant case is comparable to that upheld against a charge of indefiniteness in Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 (1923). The Second Circuit has analyzed the function of the district court in assessing the partially factual issue of claim uncertainty as follows:

"We think that the district court was too rigorous in applying the requirement of precision. This requirement serves two primary purposes: those skilled in the art must be able to understand and apply the teachings of the invention and enterprise and experimentation must not be discouraged by the creation of an area of uncertainty as to the scope of the invention. On the other hand, the policy of the patent statute contemplates granting protection to valid inventions, and this policy would be defeated if protection were to be accorded only to those patents which were capable of precise definition. The judicial function requires a balancing of these competing considerations in the individual case."

Georgia-Pacific Corp. v. United States Plywood Corp. (2 Cir. 1958) 258 F.2d 124, 136; see Georgia Kaolin Co. v. Thiele Kaolin Co. (5 Cir. 1955) 228 F.2d 267, 272. The district judge, after hearing and evaluating the testimony and examining the documentary exhibits, is in the best position to determine whether the patent sufficiently informs "the public how the discovery, if there is one, can be made useful, and how its infringement may be avoided." Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 65, 43 S.Ct. 322, 67 L.Ed. 523. The record in the instant case reveals, as borne out vividly by the fact that Arnold had no difficulty in manufacturing a workable facsimile of the Fox invention, that the Fox patent sufficiently disclosed how to utilize its inventive concept. There is also testimony in the record indicating that one skilled in the art of manufacturing drill collars can determine the degree of concavity necessary to avoid a cutting edge and can evaluate the other factors necessary in determining how to manufacture an efficient spiraled drill collar. Absolute precision in the wording of claims, while desirable,

would be an unreasonable burden to impose on an inventor. Descriptive words such as "substantial," "high," "about," and "slight excess" have often withstood attack under § 112. See Georgia Kaolin Co. v. Thiele Kaolin Co., supra. Arnold's objection to the difficulty of determining what collar designs might infringe can be alleviated by a carefully framed injunctive order by the district court, coupled, of course, with an appropriate provision in the order for ascertaining in advance of a contempt citation whether the proposed device will infringe.

By use of the phrase "at least substantially flat," Fox has merely stated that a slight concavity is within the concept of his invention; in order to avoid infringement of the Fox patent by the route of increasing the degree of concavity of the groove, possibly one would have to satisfy himself with a device with an objectionable cutting edge. Of course, we need not answer this question in the instant case because the district court found: "The degree of concavity of the groove of Defendant's collars is so slight as to fall within the term 'at least substantially flat.' The variation is so slight as not to change the function of the tool, its mode of operation, or the result." The court also determined: "The drill collars of the Defendant undertake to provide the same solution to the same problem as does the patent in suit. The Defendant's drill collars constitute substantially the same structurally as those disclosed in the Fox patent; they function in the same way and provide the same result." In such circumstances, the devices manufactured for Arnold clearly infringe Claims 2, 4, and 5 of the Fox patent.

Affirmed.

## On Petition to Reopen Decision

PER CURIAM:

Within the time allowed for the presentation of a petition for rehearing, Arnold Pipe Rentals Company, Inc. filed its petition to reopen our decision, suspend the issuance of mandate, and to remand the cause to the district court for reconsideration in the light of newly discovered evidence. It is alleged that the newly discovered evidence is a Belgian patent which Arnold claims was known to Engineering Enterprises for more than a year prior to trial in the district court, but which was not called to the attention of Arnold or the court. It is contended that the Belgian patent was granted more than a year prior to application for the Fox patent in suit, discloses the invention claimed by Fox, and that the same would alter the outcome of the issues in the case relating to prior art and invention. The petition is framed somewhat in the nature of a motion for relief under Rule 60(b) F.R.Civ.P.

Upon consideration of the petition and the briefs filed by the parties, it is ordered that the petition be, and it is denied, insofar as it seeks to reopen the decision and suspend the issuance of our mandate, but without prejudice to the right of Arnold to seek relief in the district court pursuant to Rule 60(b) F.R. Civ.P. It is further ordered that our mandate be modified to permit the filing of such motion in the United States District Court for the Southern District of Texas and to permit the district court to conduct such proceedings and take such action as it may consider appropriate. See Bros., Inc. v. W. E. Grace Mfg. Co. (5 Cir. 1963) 320 F.2d 594; Zachos v. Sherwin-Williams Co. (5 Cir. 1948) 166 F.2d 79.