NATIONWIDE CHEMICAL CORPORATION, a corporation, the First National Bank In Fort Myers, as Trustee for Nationwide Chemical Trust, a Florida Corporation, and Kalo Laboratories, Inc., Plaintiffs,

v.

Wilburn T. WRIGHT, an Individual, and Webb Wright Corporation, a corporation, Defendants.

No. 73–9 Civ. Ft.M–K.

United States District Court,
M. D. Florida,
Fort Myers Division.

March 16, 1976.

Macfarlane, Ferguson, Allison & Kelly, Tampa, Fla., for plaintiff; George T. Mobille, Michael L. Keller, Cushman, Darby & Cushman, Washington, D.C., of counsel.

Duckworth, Hobby & Allen, P.A., Orlando, Fla., for defendants.

KRENTZMAN, District Judge.

### FINDINGS

I. *The parties, the action and the issues*

1. Plaintiff Nationwide Chemical Corporation (hereinafter "Nationwide") was incorporated in Florida with a principal place of business at 2209 Fowler Street, Fort Myers, Florida 33902. Since the institution of this litigation, Nationwide was converted to a trust, the trustee being The First National Bank in Fort Myers, a co-plaintiff herein. Furthermore, since the institution of this litigation, an exclusive license under the patent in suit, Patent No. 3,420,936, has been granted to Kalo Laboratories, Inc., which is a Missouri corporation having its principal place of business at 10236 Bunker Ridge Road, Kansas City, Missouri, and who is also a co-plaintiff herein. Both these co-plaintiffs were added to the action by the Court's order entered August 1, 1974.

2. Defendant Webb Wright Corporation (hereinafter "Wright Corp.") is a Florida corporation having its principal place of business at 2845 Second Street, Fort Myers, Florida 33902.

3. Co-defendant Wilburn T. Wright (hereinafter "Mr. Wright") is a resident of Lee County, Florida at 1308 Sanbury Street, Fort Myers, Florida and is the founder, president and controlling principal of the Wright Corporation. He has been the sole stockholder of that company since its inception.

4. This Court's jurisdiction over the parties and the subject matter is uncontested, as is venue.

5. Since at least 1958, Nationwide has been in the business of manufacturing and selling chemical products for use in the agricultural field (TR. 14, 15). Plaintiff Nationwide was formed and incorporated by defendant Mr. Wright for the purposes of, *inter alia* developing and promoting inventions relating to the control and combating of bacterial and fungal plant diseases of vegetables and other like field crops.

6. Mr. Wright was Nationwide's president, chairman of the board and chief operating principal from about 1958 until 1971 (TR. 12, 14, 16 and 18–19). Mr. Wright was discharged by Nationwide's Board of Directors on or about August 1971. Shortly

thereafter, on or about October 1971, Mr. Wright founded the Webb Wright Corporation to make and sell chemical products for use in the agricultural field (TR. 19–22). Mr. Wright has been the president and controlling principal of that firm from August 1971 to date.

7. Mr. Wright, while president and controlling principal of Nationwide, had as his duties the developing of new products for Nationwide and the seeking and obtaining registration of the company's new product labels, as well as seeking and obtaining patent protection for these new products (TR. 15–16, 19). Among such new products that he developed, labeled and registered was an agricultural chemical product known as Hexide (PX 14, 15: TR. 19, 44–45).

8. The plaintiff's original complaint was filed on May 9, 1973, and alleged two causes of action, Count 1 for the contributory infringement of, or the inducement in the infringement of Claims 1, 2, 4, 5, 7 and 9 of the United States Patent 3,420,936, such infringement alleged to arise from the sale by Wright Corp. of a product known as "Super-Hex", as well as the sale of another product identified as "Hexaphene–LV" that was later introduced into the market. Count 2 of the original complaint stated a claim for relief based on unfair competition by reason of Mr. Wright's failure to assign to Nationwide the foreign patent application corresponding to United States Patent 3,420,936 and 3,346,447. A third count, Count 3, was added by an amended complaint filed on June 25, 1973 and is directed to a charge of misappropriation by Mr. Wright individually of Nationwide's proprietary formulations for its Hexide product. Defendants counterclaimed alleging the invalidity of plaintiff's patent.

## II. *Count One: Claim of Patent Infringement*

9. In its original complaint, plaintiffs accused defendant Wright Corp. of contributorily infringing and inducing the infringement of Claims 1, 2, 4, 5, 7 and 9 of plaintiff's United States Patent 3,420,936. Dur-

ing the course of the trial, plaintiffs limited its allegations to infringement of Claims 1, 2 and 4 (TR. page 478), and further withdrew its claim of contributory infringement (TR. 479). To understand the issues involved in this claim of inducing infringement, it is, of course, necessary to review the specific language of the claims in issue. Accordingly, these claims are set out next:

1. The method for combating infections in plants growing in soil infested *with pathogenic micro-organisms including bacterial spot* (xanthomonas vesicatoria) *of peppers and tomatoes, angular leaf spot* (pseudomonas lachrymans) *and downy mildew* (peronospora cubensis) *of cucumbers, damping off* (rhizoctonia) *of beans and cabbage, and damping off and sore shin* (due to rhizoctonia) *of cotton* which comprises applying to the surfaces of said plant *and* to the surface of the ground adjacent thereto a composition containing as an active ingredient 2, 2'-methylene bis-(3, 4, 6-trichlorophenol), said active ingredient being *applied at an effective dosage of less than 4 ounces per acre.* (emphasis supplied)

2. The method according to claim 1 in which the composition is applied as an aqueous spray containing the 2, 2'-methylene bis-(3, 4, 6-trichlorophenol) *at a concentration within the range 100–1200 p.p.m.* (emphasis supplied)

4. The method of protecting a crop growing in soil infected with *parasite micro-organisms including bacterial spot* (xanthomonas vesicatoria) *of peppers and tomatoes, angular leaf spot* (pseudomonas lachrymans) *and downy mildew* (peronospora cubensis) *of cucumbers, damping off* (rhizoctonia) *of beans and cabbage, and damping off and sore shin* (due to (rhizoctonia) *of cotton,* which comprises applying to the upper and under surfaces of the foliage of said crop *and* to the surface of the soil immediately under and adjacent to the plants of said crop, a bactericidal composition containing as a principle active ingredient 2, 2'-methylene bis-(3, 4, 6-trichlorophenol) immediately after the primary bacterial infection period, said composition being *applied at an effective*

*rate of not more than four ounces per acre.* (emphasis supplied).

10. Defendants, in response to this claim of inducing infringement, contend that its activities in the sale of its Superhex and Hexaphene LV products does not constitute the infringement of Claims 1, 2 or 4 for three mutually independent grounds, to-wit: first, because plaintiff's claims are clearly limited to the application of an effective dosage of *less than four ounces per acre*, which is below the range specified in defendant Wright Corp.'s label instructions. Second, because the claims are limited to certain pathogenic micro-organisms and certain plants not including citrus, and defendants' activities with respect to citrus are therefore not covered by these claims. Third, because the claims specifically call for the application of the active ingredient *both* to the upper and under surfaces of the foliage of the crop *and* to the surface of the soil immediately under and adjacent the plants.

11. The trial record shows that both defendant Wright Corp.'s Superhex and Hexaphene LV products are sold for the purpose of controlling rust mites, greasy spot, melanose and scab on citrus crops and have been so used (TR. 54–56, 72–79). The labels for these products (PX 18, 24) were prepared by Mr. Wright and demonstrate the offer of sale of these products. (TR. 42, 73–74). During the trial, plaintiffs introduced the testimony of Mr. Noori, an expert chemical analyst, whose testimony clearly established that defendant Wright Corp. was selling its Superhex and Hexaphene LV products with label instructions that would result in an effective dosage of hexachlorophene in amounts which were *greater than* four ounces per acre. (TR. 137–197). During cross-examination of this witness, Mr. Noori reviewed the analysis he had made of defendant's Superhex formulation prior to plaintiffs filing suit and upon which the complaint was originally based; and further, Mr. Noori conducted calculations which establish that defendants' Superhex formulation, as analyzed by Mr. Noori prior to suit, resulted in an effective dosage of 4.73 ounces per acre when applied in accord-

ance with defendants' label instructions. (TR. 175).

12. Plaintiffs also seek to rely upon the Doctrine of Equivalents to extend the scope of the protection beyond the limitation of "less than four ounces per acre" of hexachlorophene ingredient, and to micro-organisms and crops not recited in the claims. Since the cases relating to the Doctrine of Equivalents establish that this doctrine can only be applied in light of the file wrapper history of the patent in suit, a consideration of this file wrapper is essential.

### A. History of the Patent in Suit

#### (1) The Grandparent Application

13. Plaintiff Nationwide's first application in relation to the subject patent was filed on May 13, 1958 and was assigned Serial No. 734,851. The file wrapper of this so-called "grandparent" application was introduced at trial as plaintiffs' Exhibit 5.

14. In this grandparent application, plaintiffs' original claims were very broad, as is evidenced by claim 6 contained therein, and which is set forth next:

6. The method of combating bacterial infections of a plant growing in soil infested at the ground surface thereof with harmful bacteria, which comprises applying to the surface of the plant and to the soil surrounding the base of the plant, a halogen-containing organic bactericide in bactericidal percentages.

15. Thus, it can be seen that the original grandparent application contained *very* broad claims to the use of a generic substance, of which hexachlorophene is one species. This grandparent application further included claims 1–5 directed to a composition, as well as claims 7–10 further directed to a method of use.

16. In his first Office Action, the Examiner charged with the responsibility of examining this grandparent application rejected all of the claims on various prior art patents and publications. (PX 5, pages 13 and 14). Thereafter, there followed a long history in which plaintiff Nationwide con-

tinued to add limitations to the claims. In response to each of these amendments to the claims, the Examiner continued his rejection of the claims, primarily on the grounds that hexachlorophene was a well known bactericide, and that there was no invention in applying hexachlorophene to plant diseases. The thrust of the Examiner's arguments in this regard are set forth in the rejections at page 21 and pages 30–31 of the file wrapper of this grandparent application (PX 5). The Examiner's continuing rejections culminated in a final rejection on December 29, 1961, some two and one-half years after the original application had been filed. In his final rejection, the Examiner again clearly stated that hexachlorophene is a well known germicidal and bactericidal agent for use on skin, kitchen utensils and textiles as well as plants, as is demonstrated by the Goldsworthy reference then cited by the Examiner.

17. Responsive to the Examiner's final rejection, Nationwide filed an appeal to the Patent Office Board of Appeals. (PX 5, 43 et seq.). By the time this appeal was filed, plaintiff Nationwide had limited the number of claims to four, and had limited the breadth of the claims with respect to the claims originally filed. Subsequent to the filing of plaintiffs' appeal brief, the Examiner re-opened the prosecution of the application in order to cite a newly-discovered 1947 American Potato Journal article entitled "The Performance of New Fungicides For Controlling Late Blite On Potatoes" (DX 1). Further, the Examiner cited two additional references showing the state of the art. Responsive to the Examiner's citation of new art, and specifically to the Potato Journal article, Nationwide renewed its appeal (PX 5, 65).

18. Thereafter, Nationwide filed a request for reconsideration of the Examiner's rejection on February 4, 1964. (PX 5, page 69). This request was accompanied by an affidavit from the inventor, Mr. Wright. Mr. Wright's affidavit sets forth an analysis of a test that had been conducted on peppers with respect to hexachlorophene treatment (PX 5, 73–83). Nationwide relied on this affidavit in an attempt to establish that low volumes of hexachlorophene result in effective disease control for the plant diseases to which it is applied.

19. The Examiner then reconsidered his previous rejection, based on Mr. Wright's affidavit. However, the Examiner *continued to reject all of the claims on his previously-stated grounds.* Thereafter, plaintiff Nationwide filed yet another extensive affidavit setting forth the specific application of hexachlorophene to potatoes, attempting to approximate the test recited in the *American Potato Journal* article upon which the Examiner relied (PX 5, 94–109). Responsive to this further affidavit, the Examiner *continued his rejection.* Plaintiff Nationwide then revived its appeal, but abandoned that appeal in favor of the parent application, Serial No. 429,681, which is described next.

(2) *The Parent Application*

20. In the parent application, Nationwide amended certain portions of the specification and included certain added matter and claims 1–6, of which claim 1 is illustrative:

1. The method for combating infections in plants growing in soil infested with pathogenic organisms which comprises applying to the surfaces of said plant and to the surface of the ground adjacent thereto a composition containing as an active ingredient, 2, 2'-methylene bis-(3, 4, 6-trichlorophenol), said active ingredient being applied *at an effective dosage of less than four ounces per acre.* (emphasis supplied)

21. Thus, in this parent application Nationwide relied on Mr. Wright's affidavits in the grandparent application to show effectiveness of low dosages to support the limitation of "less than four ounces per acre". It is clear that the purpose of this limitation was to obtain allowance of the claims in the parent application with respect to the prior art cited against the claims of the grandparent application, *since this limitation to "four ounces per acre" was not presented in the grandparent application.*

22. At this point, it is important to note that plaintiffs would have the Court interpret this "less than four ounces per acre" limitation in claims 1 and 4 as merely "intended to define the preferred operative process, and to call the Patent Examiner's attention to the difference in that process and the prior art generally rather than distinguish that cited art in terms of patentability". Plaintiff Nationwide was struggling at the conclusion of the prosecution of the grandparent application to get *anything* allowed by the Patent Examiner. Their contention to argue that the inclusion of this limitation to "less than four ounces per acre" was merely to "define the preferred operative process" is apparently an attempt to place its case within the framework of certain language utilized by the Sixth Circuit Court of Appeals in *Kolene Corporation v. Motor City Metal Treating, Inc.*, 440 F.2d 77, 169 U.S.P.Q. 77 (6th Cir. 1971). As will be discussed more fully below, the application of the doctrine set forth in the *Kolene* decision is clearly inapposite to the factual situation in the present case, since, in contrast to the file wrapper history discussed above, the patentee in *Kolene* did not add the pertinent limitation in the face of a rejection by the Examiner.

23. Continuing a review of the file wrapper history of the patent in suit, it is seen that after Nationwide filed the parent application, the Examiner initially rejected all of the claims citing no less than twelve prior art patents and publications (PX 6, 28–32). Nationwide responded to this rejection and the Examiner *again* finally rejected the Claims as not patentable over a large number of prior art patents and publications, including the references to Spector, Gump, Hurst, Davidson et al. (the aforementioned *Potato Journal* article), Maier and Jones (PX 6, 39–40). Responsive to this final rejection, Nationwide filed an appeal but prior to the time the appeal was to be argued, the parent application was abandoned in favor of the grandchild application, discussed below.

### (3) *The Grandchild Application*

24. Almost nine years after filing the original grandparent application, Plaintiff Nationwide filed the grandchild application Serial No. 617,480, which ultimately culminated in the patent in suit (PX 7). All of the claims in this grandchild application included the limitation to "less than four ounces per acre". Additionally, Plaintiff Nationwide included the limitations contained in claims 1 and 4 of the patent in suit regarding certain specific plants. That is, for the first time during the long history of these patent applications, Nationwide included limitations to a method for combating infections in plants growing in soil infested with bacterial spot of peppers and tomatoes, angular leaf spot and downy mildew of cucumbers, damping off of beans and cabbage, and damping off and sore shin of cotton. In his first Office Action the Examiner finally rejected all of the claims on the same basis as the rejection of the parent application discussed above (PX 6, 33–36).

25. In response to the Examiner's new final rejection, Plaintiff Nationwide filed an amendment and accompanying arguments which were directed to the reasons why the recitation to specific pathogenic micro-organisms in claims 1 and 4 was patentable over the art on which the Examiner had previously relied on in rejecting the patent application, and for which he had finally rejected the claims in his first action on this grandparent application. In particular, Nationwide's attorney argued in great detail that there was no way to predict the manner in which these hexachlorophene compounds and certain dosages thereof will act when applied to plants under normal environmental conditions (PX 6, page 44). Because of the importance of the argument made by the attorney, it is quoted next:

It is well established in the experimental sciences of chemistry and biology, *that it is impossible to predict or determine in advance of actual experiment,* whether or not any specific compound or group of compounds is a new and useful agent for the protection of plants from attack by insects or microscopic enemies such as fungi and bacteria. Stated another way,

because of the complex chemical and biological variables involved in such matters, *it is not possible to predict* in advance that a given chemical compound will be effective for a desired biological result. (emphasis supplied)

26. Further, both expert witnesses at trial, plaintiffs' expert Dr. Pinkard and defendant's expert Dr. Blasquez, agreed that it is impossible to predict the effectiveness of hexachlorophene on any given plant disease with respect to different dosages. (See Dr. Pinkard's testimony at TR. 247–250; and Dr. Blasquez's testimony at TR. 326). Thus, the testimony of both of these experts at trial support the argument made by Nationwide's attorney to the Patent Office regarding the unpredictable nature of hexachlorophene as applied to different pathogenic micro-organisms on specific crops and in differing dosages. For these reasons, it is clear that plaintiffs are estopped both by the unpredictable nature of the subject matter of the patented method *and* its inclusion of the limitation to "four ounces per acre" in asserting the claims in suit against uses on diseases on plants other than those specified in the claims, or in effective dosages of hexachlorophene in amounts greater than four ounces per acre.

27. As noted above, plaintiffs attempted to rely on the doctrine stated in *Kolene v. Motor City Metal Treating, Inc., supra.* Indeed, plaintiffs would have the Court imply new (and broader) language in the patent claims because, according to plaintiffs, this language was more limited "than necessary to yield to the actual challenge represented by the prior art". In essence, plaintiffs would have the Court re-examine the patent application and substitute the results of such examination in lieu of that of the Examiner who conducted the evaluation on behalf of the Patent Office in the first instance.

28. The Court's only inquiry, with respect to the Doctrine of Equivalents, is to determine whether or not the limitations under consideration were added in order to obtain allowance of the patent. Having made this determination, and having answered that question in the affirmative, then plaintiffs are precluded by the Doctrine of File Wrapper Estoppel from extending the reach of the claims in question.

29. In its attempt to employ the Doctrine of Equivalents to extend the reach of claims 1 and 4, plaintiffs also seek to rely on certain equities. In particular, plaintiffs argue that if the claims in suit are unnecessarily limited, then Mr. Wright is responsible and should not be allowed to profit from such a circumstance, simply by resorting to an "unfounded estoppel argument in justification of a miniscule change in dosage that he admitted was done at least in part with the thought of avoiding infringement". However, there is no basis in the record of this case to justify plaintiffs' argument that Mr. Wright, during the course of prosecution of the three patent applications discussed above, acted affirmatively to limit the protection which plaintiff Nationwide ultimately received. In fact, the evidence adduced at trial was quite to the contrary, Mr. Wright clearly establishing that he struggled to obtain the patent protection which was ultimately secured in the patent in suit. (TR. 379). This is further evidenced by Mr. Wright's efforts set forth in the affidavits contained in the grandparent application. Mr. Wright's difficulty with Nationwide did not arise until 1970 and 1971, some years after the "less than four ounces per acre" limitation was added in the parent application. Plaintiffs' contentions on equitable grounds that it is entitled to an increased breadth of claim coverage simply by virtue of the fact that the inventor is now the defendant is without merit, and as noted above, has no factual basis in the record.

30. In *Graham v. John Deere,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, 148 U.S.P.Q. 459 (1966), the Supreme Court analyzed Section 103 of the Patent Code, the so-called "non-obviousness" test of patentability. In its decision, the Court set forth certain primary tests of patentability. The Court also went on to say that in certain close cases, secondary considerations such as commercial success, long felt but unresolved

need and the failure of others may be utilized to shed light on the circumstances surrounding the origin of the subject matter sought to be patented. Plaintiffs seek to have the Court apply these secondary considerations of patentability in order to justify an application of the Doctrine of Equivalents. In particular, plaintiffs suggest that Mr. Wright's recognition of the importance of the invention, coupled with the testimony of Dr. Pinkard to the effect that the patented method was a significant contribution and a major breakthrough, to support this contention. The short answer to plaintiffs' position in this regard is that the patented *method* is limited to the application of hexachlorophene in amounts of "less than four ounces per acre". It is again important to reiterate that Dr. Pinkard himself admitted that he could not predict the results that would be obtained at different dosages as applied to different diseases other than those which he had experienced with hexachlorophene (TR. 468). Accordingly, plaintiffs have failed to show that such "secondary considerations" would operate to justify an extension of the breadth of the claims in suit, and avoid the application of the Doctrine of File Wrapper Estoppel.

31. As was noted, defendants also contend that they do not infringe the patent in suit because plaintiffs failed to prove that the direct users of defendants' products were instructed by defendants, or, in fact, did apply defendants' products both to the upper and under surfaces of the plant foliage, as well as to the adjacent soil surface. During the trial, Dr. Pinkard testified that hexachlorophene compounds applied in the manner in which defendants' products are utilized will, when applied to certain types of crops such as apples, be transmitted to the soil at the time the leaves fall from the tree to the soil. However, the plaintiffs presented no proofs which establish that users of defendants' products on citrus were applying these products directly to the surface of the surrounding soil, or that the foliage thereof indirectly caused such application to the soil surface. Accordingly, plaintiffs have failed to prove the utiliza-

tion of this portion of the method recited in claims 1 and 4, and has therefore failed in its case of infringement in this regard.

### III. *Title to Foreign Patent Applications*

32. Mr. Wright's duties while president of Nationwide included the development of new products as well as seeking and obtaining patents therefor. Pursuant to these duties, he obtained U.S. Patent Nos. 3,346,-447 and 3,420,936, and assigned them to Nationwide. Although there is some evidence in the record that an exchange of about $70,000.00 was made in conjunction with such assignments (TR. 383), Mr. Wright acknowledged that the money was primarily directed to reimbursing him for alleged back salary and unreimbursed travel expenses that he felt was owed to him by Nationwide (TR. 412). In any event, it is implicit that Mr. Wright's relation to Nationwide at the time he made the patented inventions was such as to have required an assignment of these patents. In effect, he was operating in a fiduciary relationship with Nationwide so that the fruits of his development efforts belonged to Nationwide despite the absence of any specific written contract to that effect. Accordingly, any corresponding foreign patent applications to which Mr. Wright refuses to assign title to Nationwide, although filed in his name, were and still are held by him in a fiduciary capacity.

The record indicates that defendant Wright personally advanced $3,989.26 in fees and costs in connection with these foreign patents; for this he should recover from plaintiff Nationwide.

### IV. *Count Three: Claim of Trade Secret Misappropriation*

33. Plaintiffs urge that the Superhex formulations sold by defendants is a trade secret owned by plaintiffs, and which was misappropriated by Mr. Wright at the time he left Nationwide's employment.

34. During trial, plaintiffs indicated a reliance on the testimony of Mrs. Marjorie Fields, given at a hearing on plaintiffs'

motion for a preliminary injunction on June 15, 1973. Mrs. Fields, a Nationwide officer and employee, then testified that she had observed Mr. Wright destroying a scrap of paper which had a single Hexide formulation written thereon. During the course of the trial, defendants objected to the inclusion of Mrs. Fields' testimony in the trial record, correctly noting that the hearing on plaintiffs' motion for preliminary injunction was had before plaintiffs had added its count three for trade secret misappropriation, and that defendants had therefore not had an adequate opportunity to cross-examine Mrs. Fields with respect to the allegations of this count. Plaintiffs then offered to produce Mrs. Fields for cross-examination during the trial, and the Court ordered that Mrs. Fields' testimony given at the hearing on plaintiffs' motion for preliminary injunction be stricken unless she be so produced. Since she was not produced by plaintiffs, her testimony has not been considered in that regard.

35. Plaintiffs also rely on an admission elicited from Mr. Wright during his deposition that the Superhex and Hexide formulations were "substantially identical for all practical purposes". (TR. 31).

36. These facts do not make out a case in trade secret misappropriation. Plaintiffs have failed to show the requisite identity between the Superhex and Hexide formulations, or that the Hexide formulations were, in fact, secret. During the course of the trial, both plaintiffs' Hexide formulation as known by Mr. Wright, and Mr. Wright's Superhex formulation were introduced into the record and subjected to protective orders. A review of these formulations and the formulations set forth in the patent in suit show as much identity between Mr. Wright's Superhex formulation and the formulations of the patent in suit, as there is identity between Mr. Wright's Superhex formulation and plaintiffs' Hexide formulation (as known by Mr. Wright during his employment by Nationwide). In fact, the major differences between all of these formulations appear to be differences in the inert ingredients. During trial, Mr. Wright's uncontroverted testimony estab-

lished that the amount of inert ingredients added to each "batch" of plaintiff's Hexide formulation while he was employed by Nationwide, or to his own Superhex formulation after leaving Nationwide's employment, depended upon the availability of these inert ingredients. (TR. 425). Further, Mr. Wright's uncontradicted testimony established that no attempt at secrecy was made with regard to the manner in which the Hexide formulations were prepared while he was employed by Nationwide. Apparently, the formulation book was left open on a work bench in the formulation room, which had a large garage-type door opening into an alley way. No attempt was made to prevent neighbors, visitors, stockholders or salesmen from entering or leaving through this rear door, which was kept open at all times. Mr. Wright further testified that the formulation book was in plain view of any one who happened to walk into the room. Accordingly, it is clear that plaintiffs have failed to establish the existence of a trade secret, or substantial identity between plaintiffs' Hexide formulations and Mr. Wright's Superhex formulations.

### V. The Validity of the Patent Claims in Suit

37. In essence, the defendants' position on the alleged invalidity of the patent claims in suit is that they are invalid if interpreted to include the treatment of citrus crops because Mr. Wright had made no disclosure of such treatment in any of his patent applications until more than one year after sale and/or public use of a Nabac hexachlorophene-containing product for citrus crop treatment. The record is inadequate to establish a definite date when such a Nabac product was first sold and/or publicly used and, in this regard, Mr. Wright was unable to give a close approximation of such date, or dates (TR. 369–375). Giving Mr. Wright every benefit of the doubt, the earliest date that emerges is "in the spring of 1964", when Nabac was alleged to have been transmitted to an Orlando researcher for test purposes (PX 9 and 10; DX 5; TR.

838

121, 375). Leaving aside the fact that experimental tests are not sufficient to establish sale or public use under the patent statutes, the filing date of the parent application Serial No. 429,681, which admittedly discloses the treatment of citrus crops, is February 1, 1965—clearly less than a year after the spring of 1964.

38. The validity of the claimed invention is further demonstrated by the testimony of the expert, Dr. Pinkard, who has extensive experience in plant pathology and who had been working with hexachlorophene-containing compounds on various crops for many years preceding Mr. Wright's work (TR. 230, 251, 459). In fact, this work was carried on in association with Dr. Gump whom the record shows was the inventor of hexachlorophene itself (DR 21; TR. 459). Dr. Pinkard and his associates were particularly impressed by the low dosage application perfected by Mr. Wright in that they had been accustomed to using high dosages of fungicides in treating plants. Thus, Mr. Wright's development was a significant advance over what was known or considered to be efficacious at the time in that it went against the teaching of the art (TR. 459–463). Finally, Mr. Wright himself considered the patent on his own invention to be "very valuable" (PX 13; TR. 57).

39. There are other indicia of record supporting a finding of patent validity herein.

(a) It is clear that the Patent Office had full opportunity to review all of the relevant prior art. The only such prior art urged by defendants is the aforesaid *Potato Journal* article (TR. 121–122);

(b) The patented invention fulfilled a long-felt need in the agriculture industry as recognized by Dr. Pinkard (TR. 459–461); and

(c) The defendants themselves recognized the merit of the patented invention.

CONCLUSIONS OF LAW

A. This Court has jurisdiction of the parties in the subject matter, and venue is properly established in this judicial district and division.

B. Acts that constitute infringement of the United States Patent are codified in Title 35 U.S.C. 271, and paragraph (b) thereof extends to those who induce the infringement of any United States Patent. Inducement is found when one knowingly causes, or urges, or encourages or aids another in the infringement of a patent claim, even though he himself has not infringed the patent claim by making, using or selling the invention. *Fromberg, Inc. v. Thornhill,* 315 F.2d 407, 411–412 (5th Cir. 1963).

C. To establish the infringement of a patent, resort must be had in the first instance to the words of the patent claims in suit. If the accused subject matter falls clearly within any of the claims, then a prima facie case of infringement is established. *Graver Tank Company v. Linde Air Products,* 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); *Zeigler v. Phillips Petroleum Company,* 483 F.2d 858 (5th Cir. 1973) cert. denied 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485. However, it is also recognized that imitation of a patented invention which does not embody every literal detail of the claims, yet which performs substantially the same function in substantially the same way to obtain the same result would, nevertheless, be an infringement under the Doctrine of Equivalents. *Graver Tank Company v. Linde Air Products Company, supra,* 339 U.S. at pages 607–608, 70 S.Ct. 854; and *Zeigler v. Phillips Petroleum Company, supra* at pages 868–869. This doctrine is the "mere expression and application of the view that like things are alike and that they are not made unalike by formal and nonsubstantial changes, no matter how cunningly contrived the dissimulation, how clever the changes in form". *Matthews v. Koolvent Metal Awning Company,* 158 F.2d 37, 40 (5th Cir. 1946); cited and followed in *Samuelson v. Bethlehem Steel Company,* 323 F.2d 944, 949–950 (5th Cir. 1963), cert. denied 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659.

D. The reach of the Doctrine of Equivalents is determined against the context of the patent, the prior art and the

particular circumstances of the case. *Graver Tank Company v. Linde Air Products, supra* 339 U.S. at page 609–610, 70 S.Ct. 854. In particular, the patentee may be estopped from recapturing the coverage surrendered by an amendment during the Patent Office prosecution if such surrender was made in order to obtain allowance of the patent. This Doctrine of File Wrapper Estoppel was succinctly stated by the Fifth Circuit Court of Appeals in *Rosen v. Kahlenberg,* 474 F.2d 858, 177 U.S.P.Q. 18 (5th Cir. 1973) where the Court stated:

> One principle precluding (the Doctrine of) equivalency is known as file wrapper estoppel. The file wrapper is the file in the Patent Office including all prior claims rejected by the Patent Examiner, as well as the Examiner's reasons for rejecting the claims and the applicant's remarks in submitting new claims. *If the Examiner rejects a claim for failing to disclose a new discovery and the patentee amends the claim, the patentee is estopped from recapturing the coverage surrendered by the amendment. Exhibit Supply Company v. Ace Patents Corporation,* 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736 (1942). (Emphasis supplied).

 E. At the time the parent application was filed, plaintiff Nationwide specifically and intentionally limited the claims to "less than four ounces per acre" in the face of a long and continued rejection by the Examiner in the grandparent application. Thus, plaintiffs are clearly estopped from recapturing the coverage surrendered by this amendment of its claims. Further, the amendment of the claims in the grandchild application to include the limitation to the treatment of specific pathogenic micro-organisms for specific plants constitutes an intentional limitation of the claims in order to avoid the prior art relied on by the Examiner and to secure allowance of the claims in question. Clearly, plaintiffs are estopped from extending the reach of claims 1, 2 and 4 to cover defendant's activities.

 F. In patent law, a distinction has developed between generic claims to so-called "mechanical" inventions on the one hand, and generic claims to "chemical and biological" inventions on the other. See generally *In re Cook and Marigold,* 439 F.2d 730, 58 CCPA 1049, 169 U.S.P.Q. 298 (1971), and cases cited therein. Generally, this distinction may be stated as follows. For generic claims to mechanical inventions, the scope of the claim will be interpreted as "broadly as the prior art will allow". This precept recognizes that the teaching of one mechanical embodiment is sufficient to suggest to one skilled in the mechanical arts various other mechanical techniques which will function in substantially the same way to achieve substantially the same result. This is, of course, due to the well known and predictable result derived from using mechanical elements. However, with respect to generic claims to chemical and biological inventions, the scope of the claims is limited to what those skilled in the art could reasonably predict from the inventor's disclosure. This precept recognizes that one skilled in these chemical and biological arts cannot always reasonably predict how different chemical compounds and elements might behave under varying circumstances. Thus, in so-called "chemical" patent law practice, the claims of a patent are limited by the scope of what the disclosure reasonably teaches to one skilled in the art. Plaintiff Nationwide, during the prosecution of the grandchild application, presented arguments as to the unpredictability of the application of hexachlorophene in amounts of less than four ounces per acre for certain specific pathogenic micro-organisms found on certain specific plants. Plaintiffs' expert, Dr. Pinkard, confirmed this lack of predictability. Having relied on these arguments to obtain issuance of the patent, plaintiffs are now estopped from asserting an extension of the patent to cover other pathogenic micro-organisms attacking citrus, irrespective of whether the amount of hexachlorophene is applied in effective dosages of "less than four ounces" or not.

 G. Proof of inducement of infringement under 35 U.S.C. 271(b) requires proof of direct infringement of all of the

elements of the claims. See *Fromberg, Inc. v. Thornhill, supra*; and *Fromberg, Inc. v. Gross Manufacturing Company, Inc.,* 328 F.2d 803, 140 U.S.P.Q. 641 (9th Cir. 1964). A review of the trial record establishes that the record is void of any proof on the part of plaintiffs that defendants have induced any person to apply defendants' Superhex or Hexaphene LV formulations both to the upper and under surfaces of the foliage of the plants and to the soil adjacent thereto. Accordingly, plaintiffs' case of inducement has not been proven.

■ H. Even though Mr. Wright is the inventor, he is not estopped on equitable grounds. In *Scott Paper Company v. Marcalus Manufacturing Company,* 326 U.S. 249, 66 S.Ct. 101, 90 L.Ed. 47, 67 U.S.P.Q. 193 (1945) the Supreme Court held that an inventor is not estopped from denying infringement by reference to the prior art or to the file wrapper of the application so as to establish a restricted scope of the claims. Although it is noted in passing that *Scott Paper* case, *supra* and *Westinghouse v. Formica,* 266 U.S. 342, 45 S.Ct. 117, 69 L.Ed. 316 (1924) indicate that an assignor is estopped from denying the validity of the patent, more recent decisions have held that even the inventor may contest the validity of the patent if no warrant as to validity has been made. See *Coastal Dynamics Corporation v. Symbolic Displays, Inc.,* 469 F.2d 79, 175 U.S.P.Q. 81 (9th Cir. 1972) and *Brand Plastics Company v. Dow Chemical Company,* 267 F.Supp. 1010, 154 U.S.P.Q. 140 (C.D.Cal.1967).

■ I. Plaintiffs did not establish that a trade secret existed or that there was a substantial identity between plaintiffs' Hexide formulation (as known by Mr. Wright during his employment at Nationwide) and Mr. Wright's Superhex formulation.

■ J. The starting point in any consideration of patent validity is Title 35 U.S.C. § 282: "A patent shall be presumed valid. * * * The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such validi-

ty". This burden is a heavy one, and proof of patent invalidity must be established by clear and convincing evidence. *Harrington Manufacturing Co. v. White,* 475 F.2d 788, 793–794 (5th Cir. 1973), cert. denied 414 U.S. 1040, 94 S.Ct. 542, 38 L.Ed.2d 331; *Ingersoll-Rand Company v. Brunner & Lay,* 474 F.2d 491, 496 (5th Cir. 1973), cert. denied 414 U.S. 865, 94 S.Ct. 125, 38 L.Ed.2d 117; *Van Gorp Manufacturing, Inc. v. Townley Industrial Plastics, Inc.,* 464 F.2d 16, 17 (5th Cir. 1972); *Stamicarbon N.V. v. Escambia Chemical Corporation,* 430 F.2d 920, 924–925 (5th Cir. 1970), cert. denied 400 U.S. 944, 91 S.Ct. 245, 27 L.Ed.2d 248. See also *Malsbary Manufacturing Co. v. Ald, Inc.,* 447 F.2d 809, 812 (7th Cir. 1971).

■ K. The notice filed by defendants pursuant to Title 35 U.S.C. § 282 only lists one reference and that reference had been cited and considered by the U.S. Patent Office during the prosecution history of the United States patent alleged to be infringed. Where, as here, the principal reference relied upon by the defendants had already been considered and rejected by the Patent Office, the statutory presumption of validity is strengthened and entitled to even more weight. *Hobbs v. United States Atomic Energy Commission,* 451 F.2d 849, 863 (5th Cir. 1971); *Stamicarbon N.V. v. Escambia Chemical Corporation, supra,* at page 926; *Arnold Pipe Rentals Company v. Engineering Enterprises, Inc.,* 350 F.2d 885, 888–889 (5th Cir. 1965); *Bryan v. Garrett Oil Tools, Inc.,* 245 F.2d 365, 373 (5th Cir. 1957); *Southern States Equipment Corp. v. USCO Power Equipment Corp.,* 209 F.2d 111, 118–119 (5th Cir. 1953).

■ L. One who asserts a defense of prior sale or public use pursuant to Title 35 U.S.C. § 102(b) in a patent infringement suit has a very heavy burden of proof which must be demonstrated by clear and convincing evidence. *Metal Arts Company v. Fuller Company,* 389 F.2d 319, 321 (5th Cir. 1968); *Southern Implement Manufacturing Co. v. McLemore,* 350 F.2d 244, 249–250 (5th Cir. 1965); *Inglett & Company v. Everglades Fertilizer Company,* 255 F.2d 342, 346 (5th Cir. 1958); *Zachos v. Sherwin-Wil-*

*liams Company,* 177 F.2d 762, 763 (5th Cir. 1949). Mere experimentation or testing does not suffice. *In re Yarn Processing Patent Validity Litigation,* 498 F.2d 271, 277–278 (5th Cir. 1974), cert. denied 419 U.S. 1057, 95 S.Ct. 640, 42 L.Ed.2d 654.

M. Defendants have not established or proved the invalidity of plaintiffs' patent herein.

N. Title to any foreign patents corresponding to U.S. Patent Nos. 3,346,447 and 3,420,936 obtained by Mr. Wright while an employee of Nationwide are held by Mr. Wright in a fiduciary capacity and should be assigned to Nationwide or its assignees upon reimbursement to him of fees and costs thereof paid by Mr. Wright in the sum of $3,989.26.

O. Judgment shall be entered on these findings for the defendants as to all issues except as to plaintiff Nationwide's claim for foreign patent rights as to which judgment shall be for said plaintiff or its assignees as provided herein.

P. Each party is to bear its own costs herein.