**SWIFT AGRICULTURAL CHEMICALS CORPORATION, A Delaware Corporation, Plaintiff,**

v.

**FARMLAND INDUSTRIES, INC., A Kansas Corporation, and Farmers Chemical Company, A Kansas Corporation, Defendants.**

Civ. A. No. 78–4153.

United States District Court,
D. Kansas.

Sept. 15, 1980.

---

MAINE

SUBCOMMITTEE ON JUDICIAL STATISTICS
1980 BIENNIAL JUDGESHIP SURVEY
PAGE 1

| | | Dec. 31, | TWELVE MONTH PERIOD ENDED | | | | |
|---|---|---|---|---|---|---|---|
| | | | JUNE 30, | | | | |
| | | 1979 | 1979 | 1978 | 1977 | 1976 | 1975 |
| OVERALL WORKLOAD STATISTICS | Filings | 489 | 478 | 474 | 474 | 353 | 362 |
| | Terminations | 415 | 412 | 313 | 365 | 339 | 323 |
| | Pending | 727 | 669 | 603 | 442 | 333 | 319 |
| | Percent Change in Total Filings — Current Year | Over June 1979: 2.3 | | | | | |
| | | Over Earlier Years: | | 3.2 | 3.2 | 38.5 | 35.1 |

52

22

John E. Wilkinson, Wilkinson & Graves, Topeka, Kan., John W. Hofeldt, Britton A. Davis, Haight, Hofeldt, Davis & Jambor, J. Calvin Langston, Chicago, Ill., for plaintiff.

J. Donald Lysaught, Weeks, Thomas, Lysaught, Bingham & Mustain, Overland Park, Kan., Warren N. Williams, Schmidt, Johnson, Hovey & Williams, Joseph A. Crites, Kansas City, Mo., for defendants.

## MEMORANDUM & ORDER

SAFFELS, District Judge.

This is a patent infringement action brought pursuant to the Patent Statute, 35 U.S.C. § 1, *et seq.* Plaintiff in this action, Swift Agricultural Chemicals Corporation (hereafter Swift) owns a patent for a process in which:

"Phosphoric acid having $P_2O_5$ content of between about 55%–65% is reacted with ammonia under conditions that simultaneously neutralize and molecularly dehydrate the acid whereby at least 20% of the orthophosphate is converted to non–orthophosphate (polyphosphate) and the resulting ammonium polyphosphate possesses self–sequestering properties." [1]

The process, officially designated as U. S. Letters Patent No. 3,464,808, was invented by one Tommy Carter Kearns, a former employee of Swift, and will be referred to as the '808 or Kearns patent. The patent was acquired on September 2, 1969. A detailed technical explanation of the background of this case is not necessary here, but a brief discussion will perhaps be useful. Agriculturally rich nations, such as the United States and Canada, generally make such intensive use of their tillable land that the essential plant nutrients found in the soil are steadily depleted. Less well–endowed countries, on the other hand, face the problem of growing crops for consumption or export upon land that is either less fertile or less extensive than that possessed by their more fortunate neighbors. One important consequence of this situation is an increased demand for synthetic fertilizers. Such fertilizers may be in either solid or liquid form, and, in addition to their obvious advantages, tend to share certain negative characteristics. These include a high cost of manufacture (traditionally attributed to the necessity of using top–grade phosphoric acid in the manufacturing process), as well as a certain difficulty in application, caused by the tendency of chemical impurities present in the fertilizer to precipitate into a gelatinous sludge that clogs

---

1. Plaintiff's Exhibit No. 1, Kearns Patent, Col. 1, ll. 13–19.

storage tanks and applicator nozzles. The process embodied in the '808 patent is an attempt to resolve the problems usually attendant to the manufacture of synthetic fertilizer, since it is designed to produce in a relatively inexpensive manner a rich product bearing the capacity to hold in suspension, or sequester, those chemical impurities which would otherwise coagulate to make application more difficult. Plaintiff claims that defendants have infringed the '808 or Kearns patent by the unauthorized use of the process described in the patent.

This action was tried to the Court, following extensive discovery by both parties. The parties introduced a very large number of documents into evidence. The case involves only two essential questions: whether the patent is valid; and, if so, whether it has been infringed. These questions, along with related issues, are discussed below. Findings of Fact and Conclusions of Law are separately stated.

## I. THE VALIDITY OF THE KEARNS PATENT

### A. ANTICIPATION BY PRIOR ART

■ Defendants have attacked the validity of the '808 patent on the ground that it was anticipated by prior art. Defendants have drawn attention to the fact that the Kearns patent is a process patent, one in which certain materials are dealt with in a particular manner in order to produce a special result. It is generally recognized that the patentability of a method or process claim "must rest on the method steps recited, not on the structure used, unless that structure affects the method steps." *Leesona Corp. v. United States*, 530 F.2d 896, 208 Ct.Cl. 871 (1976). *See also, Chemical Construction Corp. v. Jones & Laughlin Steel Corp.*, 311 F.2d 367 (3rd Cir. 1962).

Defendants argue that plaintiff's patent has been anticipated in at least three separate instances. The first such instance involves a patent acquired by one Donald C. Young, U. S. Patent No. 3,044,851, on July 17, 1962. Plaintiff distinguishes the Young and Kearns patents by characterizing the former as a "three–step process" as compared with the "single–step" taught by the Kearns patent. The evidence, however, does not suggest that such a distinction is meaningful. Both processes produce an ammonium phosphate fertilizer having self–sequestering properties. Both do so by reacting ammonia and phosphoric acid for comparable time periods and at comparable temperatures. Similar reactor vessels may be used. The only literal difference between the two processes is that the Young patent speaks of separate heating and neutralization steps, while the Kearns patent describes a process in which both steps occur simultaneously. The Court concludes that this variance between the processes does not mean that the Kearns and Young patents have presented different "methods" to produce the same end. And, as has been previously noted, where process patents are concerned, the nature of the method involved is the crucial factor. Moreover, as defendants have demonstrated, the Young patent teaches "on its face" a simultaneous process, as shown in Figure 8 of the patent.[2] In short, the Young patent must be regarded as anticipatory prior art with regard to the Kearns patent.

Defendants also argue that the Kearns patent was anticipated by the work of J. G. Getsinger, U. S. Patent No. 3,382,059.[3] Getsinger acquired his patent on May 7, 1968. Plaintiff contends that any comparison between the Kearns and Getsinger patents is inapposite. In particular, plaintiff attempts to distinguish the two processes by alluding to the fact that the Getsinger patent provides for the use of two vessels rather than just one. Further, plaintiff asserts that the vessel in which the pertinent reaction takes place is not a "jet reactor" as called for in the Kearns patent. Finally, plaintiff states that the Kearns patent is markedly different from that of Getsinger, on the theory that the residence time of the latter process is much longer than that of the former.

**2.** Defendants' Exhibit A–3, Young Patent, Col. 13, 11. 28–56.

**3.** Defendants' Exhibit C–3.

The Getsinger patent discloses a process for the production of ammonium polyphosphates from wet process phosphoric acid, in which the phosphoric acid is first partially ammoniated at low temperature (250°–350° F) and then fed to a reactor, where it is reacted with a stream of ammonia to form an ammonium polyphosphate melt. The streams of partially neutralized phosphoric acid and ammonia are contacted in reactor vessel No. 6 of the patent, at a preferred temperature of 400°–500° F.

 As we have previously discussed, an attempt to distinguish these processes on the ground that the Getsinger patent contemplates a "tank" rather than a "jet" reactor is not a cognizable defense of patentability, since "method" rather than equipment is of crucial importance in a process patent. *Leesona Corp. v. United States, supra.* And simply because reactor vessel No. 6 is not necessarily depicted as a "pipe" or "jet" reactor does not mean that such a device would be unsuitable to the Getsinger invention, since the claims of a patent generally are not strictly limited to a device described in the specifications or depicted in a drawing. *Arnold Pipe Rentals Co. v. Engineering Enterprises, Inc.,* 350 F.2d 885 (5th Cir. 1965); *Ziegler v. Phillips Petroleum Co.,* 483 F.2d 858 (5th Cir. 1973).

The fact that the Getsinger patent utilizes two vessels is likewise of negligible importance. This is so because the essence of the patent is found in the chemical reaction which takes place in reactor vessel No. 6. The Getsinger patent involves a continuous process, the nature and final product of which are the same as those in the '808 patent. The evidence indicates that the same simultaneous neutralization and molecular dehydration of the acid which is crucial to the '808 patent occurs in reactor vessel No. 6 of the Getsinger patent, since that vessel is the only place where the appropriate temperatures and pressures are present. Furthermore, an ammonium poly-

phosphate solution with self–sequestering properties is the product of both processes.

A third area of dispute between the parties as to the Getsinger patent concerns the residence time attributable to the process. The Getsinger patent states that the "retention" time of the process is from one (1) to one hundred eighty (180) minutes.[4] Since the Kearns patent calls for a residence time of less than one (1) second, it would seem clear that there could have been no anticipation of Kearns by Getsinger. The Getsinger patent, however, defines "retention" time in terms of the period during which the melt remains in the reactor.[5] Plaintiff argues that Getsinger's representations as to the "retention" time are conclusive on the point. Defendants, however, have approached the problem in a different manner. A central question in this lawsuit, on the issue of infringement, is the residence time of defendants' process. Plaintiff has defined "residence" (or "contact") time as follows:

"... The 'period' referred to in Claim 1 of the patent is the average time during which the reaction product, consisting of molten ammonium polyphosphate, superheated steam and unreacted ammonia, is in the reactor at temperatures of between about 450° F. and about 650° F."[6]

Plaintiff calculates this time period in the following manner:

"... The internal volume of the reactor pipe is ascertained, the volumes per second of the reaction product, principally steam and melt, are determined, and the former is divided by the latter to give the residence time."[7]

In analyzing that work which they consider to have been anticipatory of the Kearns patent, defendants have utilized the formula advanced by plaintiff to calculate respective residence times. Plaintiff has strenuously resisted this procedure on the theory that defendants may not read into the prior art the teaching of the Kearns

4. *Id.,* at Col. 10, 11. 73–75.

5. *Id.;* deposition of J. G. Getsinger, Defendants' Exhibit M, Vol. II, pp. 22–23, and Vol. I, p. 50.

6. Defendants' Exhibit T–21, Answer to Interrogatory No. 25.

7. Defendants' Exhibit U–21, p. 3.

patent. *Graham v. John Deere Co.,* 383 U.S. 1, 36, 86 S.Ct. 684, 703, 15 L.Ed.2d 545 (1966). Plaintiff contends that crucial elements such as a method for calculating residence time must come only from the "four corners" of the patent itself. If that were the case, however, there would have been no way to calculate residence time for any of the patents in question, including the patent in suit, since none of the patents disclose a formula for measuring residence time. These patents "teach" matters such as a method for determining residence time only in the sense that scientists, engineers and patent attorneys, possessed of certain skills relative to mathematics, chemistry and physics, are able to reason abstractly from other information given in the patent to make the desired computations. If the evidence in this case has shown anything, it is that although the fundamental physical laws are immutable for both plaintiff and defendants, the assumptions upon which calculations derived from those laws are based vary widely.

Given the fact that the prior art patents in this case do not contain specific formulae for the derivation of residence time, and in view of the fact that several viable methods, based upon different assumptions, may exist for making such a calculation, it is not unreasonable, for purposes of comparison, for defendants to analyze the prior art in terms of the theory of residence time advanced by plaintiff.

Using plaintiff's formula, D. C. Young measured the residence time of his patent, No. 3,044,851, and found that period to be less than one second, corresponding to the residence time claimed in the Kearns patent. Young's conclusion was based upon actual test records, as well as data from the patent itself, and plaintiff has not questioned the genuineness of Young's figures. However, plaintiff does criticize the use of its formula in connection with the analysis of the Getsinger patent, on the ground that the physical distinctions between the processes make the application of the Swift formula inappropriate in this case.

Our previous comments regarding the alleged distinctions between the Kearns and Getsinger patents should make it clear that we consider defendants' approach to this problem to be entirely appropriate. The residence time of the Getsinger patent, using plaintiff's formula, is less than one second. This being the case, and taking into account the fact that there are no other reasonable bases for distinguishing the two patents, it is our conclusion that the Kearns patent was also anticipated by the Getsinger patent.

Defendants' argument regarding anticipation refers finally to a patent application entitled "Production of Ammonium Phosphate," Serial No. 352,764, filed on March 18, 1964, by William A. Lutz and Manuel J. Rubio (hereafter referred to as the Lutz application). The process described in the Lutz application is virtually identical to the one found in the Kearns patent. And in deposition and affidavit, Mr. Lutz has testified that the residence time of his invention, calculated with the use of the Swift formula, is on the order of .01 seconds.[8] Plaintiff contests the relevance of the Lutz application to this case on two grounds. Plaintiff first states that Lutz is irrelevant here because the residence time was calculated with the Swift formula. We believe that our previous analysis of this point disposes of that argument. Plaintiff's second contention regarding Lutz is that it may not be relied upon here because the application was abandoned following an interference proceeding in which priority was awarded to the Bookey, *et al.,* patent, No. 3,375,003. The Lutz application, however, was filed in March, 1964, and was not abandoned until 1971.[9] The relevant portion of the patent statute, 35 U.S.C. § 102(g), states in part:

"A person shall be entitled to a patent unless—

\* \* \* \* \* \*

"(g) before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it. . . ."

---

**8.** Defendants' Exhibit A, B–1 and C–1.

**9.** Defendants' Exhibit X–22.

This language has been interpreted to mean that an abandonment is irrelevant unless it occurred "before the applicant's invention." *Allen v. W. H. Brady Co.*, 508 F.2d 64, 67 (7th Cir. 1974). In this case, it is clear that the abandonment of the Lutz application did not occur until after the Kearns process was patented. When this fact is considered in conjunction with the technical similarities which characterize the Lutz application and the Kearns patent, it is indeed reasonable to conclude that the Lutz application constituted anticipatory prior art with regard to the Kearns patent.

## B. *OBVIOUSNESS*

If it is assumed, in spite of the foregoing discussion, that the Kearns patent is vital enough to withstand an attack on its validity based upon the concept of anticipation, the patent must still contend with the doctrine of obviousness. The pertinent section of the patent statute, 35 U.S.C. § 103, states in part as follows:

> "A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. . . ."

Defendants submit that the '808 patent fails the test of obviousness for the reason that it is an ineffective "combination" patent. A combination patent is one which draws together in a new format elements from separate, older inventions. In order for such a combination of prior art to be patentable, it must be synergistic, that is, "result[ing] in an effect greater than the sum of the several effects taken separately." *Anderson's–Black Rock v. Pavement Co.*, 396 U.S. 57, 61, 90 S.Ct. 305, 308, 24 L.Ed.2d 258 (1969); *see also, Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976); *Great A & P Tea Co. v. Supermarket Corp.*, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950). The question of obviousness is to be determined by the application of a three–step analysis:

1. What is the scope and content of the prior art?

2. What differences exist between the prior art and the claims at issue?

3. What is the level of ordinary skill in the pertinent art?

*See Graham v. John Deere Co., supra, 383 U.S. at 17, 86 S.Ct. at 693.* Our previous discussion on the issue of anticipation should be helpful to our analysis of these points.

The prior art in this case is characterized by the Young and Getsinger patents, as well as the Lutz application. As we have seen, both the Young patent and the Lutz application depict a "pipe" or "jet" reactor, and although the Getsinger patent does not literally describe such a vessel, it is not therefore precluded from the adoption of such a device. *Arnold Pipe Rentals Co. v. Engineering Enterprises, Inc., supra.* There can be no reasonable dispute as to the fact that essentially the same chemical reaction takes place in all three of these processes, and that the same substance is produced. Although the range of temperatures at which the reaction occurs varies with the Young and Getsinger patents and the Lutz application, those temperatures overlap, not only as to each other, but as to the Kearns patent as well. Likewise, although the residence time attributable to each of these processes may vary, all of the residence times in question, measured by the standard of the '808 patent, fall within a one–second limit. Each of the essential claims of the Kearns patent, then, are to be found in the prior art.

The answer to the first part of the *Graham* test helps to provide the solution to the second portion of that analysis. Any differences which may exist between the prior art and the '808 patent are trifling at best. Certain minor distinctions as to the equipment involved with the prior art, as compared to that used in the Kearns process, are present in this case, at least with regard to the Getsinger patent. But, as we have attempted to make clear, since the patent in suit is one for a chemical process, it is the method of that process which is crucial to the question of its patentability. And in this case, the methods by which all of the

prior art processes, as well as the Kearns patent, arrive at the production of an ammonium polyphosphate fertilizer having self–sequestering properties are so similar as to make plaintiff's attempts to distinguish them little more than an overly technical exercise in nitpicking.

Finally, what was the level of ordinary skill in the art prior to or contemporaneous with the development of the Kearns process? Once again, the history of the prior art in this matter is suggestive of the answer to this question. The mere fact that Young, Getsinger and Lutz were all, independently of each other, attempting to design a device for the production of an easily–applicable plant fertilizer is clearly indicative of the fact that those ordinarily skilled in the art were aware of a problem urgently in need of resolution. In addition, all three of these inventors arrived at the same solution to the problem, in that each of them sought to employ the same or a similar method in which streams of ammonia and phosphoric acid are contacted, under pressure, for similar time periods and at similar temperatures, to form the same product. We have in this case, then, three separate instances in which a prior art inventor developed a method which is conceptually identical to the one set forth in the patent in suit. All of this indicates to the Court that the method or process claimed by Kearns was within the knowledge of the average artisan in the field, a conclusion which mandates a finding that the Kearns patent is invalid for obviousness. *See Concrete Appliances Co. v. Gomery*, 269 U.S. 177, 46 S.Ct. 42, 70 L.Ed. 222 (1925); *Novo Industrial Corp. v. Standard Screw Co.*, 374 F.2d 824 (7th Cir. 1967).

## II. *INFRINGEMENT*

Assuming *arguendo* that the Kearns patent is valid, does the evidence in this case indicate that defendants infringed upon that patent? Plaintiff naturally contends that infringement is clearly made out here, arguing that defendants have encroached upon every material aspect of the Kearns claims. Defendants offer three major points in response to plaintiff's charge: first, that defendants' process is to be dis-

tinguished from that of plaintiff upon the ground that the former utilizes superphosphoric acid, while the latter restricts itself to the use of phosphoric acid; second, that the residence time of defendants' process is greatly in excess of that claimed by the '808 patent; and, third, that plaintiff is estopped to assert a claim of infringement in this action by operation of the legal doctrine of file wrapper estoppel.

## A. *SUPERPHOSPHORIC ACID*

The record in this case is replete with seemingly endless discourses on the meaning of the terms "phosphoric" and "superphosphoric" acid, and on the question of whether or not the residence time of defendants' process exceeds one second. To the uninitiated, such discussions would appear to have as much relevance as a debate among medieval philosophers upon the question of how many angels can fit on the head of a pin. In a case such as this, however, such evidently trivial points take on far–reaching significance.

Since we have assumed, for this portion of our order, that the Kearns patent is valid, the issue of infringement will turn on whether there are significant differences between the '808 patent and the process used by defendants. In the context of this lawsuit, the word "significant" means any deviation from the patent as set forth by Kearns.

The Kearns patent contains the following language:

"Previous attempts to obtain non–gelatinous aqueous solutions of ammonium phosphate substantially free of insoluble solids have generally been directed to methods using superphosphoric acid. Superphosphoric acid is made by further evaporation of 54% $P_2O_5$ phosphoric acid to about 70% $P_2O_5$. Superphosphoric acid, having a large percentage of its phosphate in the non–ortho form of which a large portion is in the pyro form, can be neutralized with ammonia in aqueous solutions without the metal ion impurities precipitating. However, superphosphoric acid is a premium chemical as

large amounts of free and molecularly combined water must be evaporated from regular phosphoric acid. Furthermore, when superphosphoric acid is reacted with ammonia, the reaction is quite exothermic and heat must be subtracted from the system"[10] [Emphasis supplied.]

The patent goes on to declare that:

"Still another object of this invention is the *elimination of the costly step of making superphosphoric acid in producing a non–precipitating liquid ammonium phosphate fertilizer.*"[11] [Emphasis supplied.]

Furthermore, throughout the patent, Kearns used the adjective "phosphoric" to describe the acid used in his process. Thus, the Abstract of the Disclosure states:

"*Phosphoric* acid having $P_2O_5$ content of between about 55%–65% is reacted with ammonia ..."[12] [Emphasis supplied.]

And when listing the objects of the patent, Kearns claims:

"A further object of this invention is to provide a method whereby liquid ammonium polyphosphates of analysis higher than 10–34–0, and *derived from wet process phosphoric acid* ..."[13] [Emphasis supplied.]

Finally, claim one of the patent declares:

"A process for preparing ammonium polyphosphates having self–sequestering properties comprising: supplying a stream of ammonia to a jet reactor; supplying a stream of *phosphoric acid* ..."[14] [Emphasis supplied.]

Apart from any considerations of estoppel, a matter which will be dealt with below, the most reasonable conclusion to be reached from all of this is that Kearns drew a definite distinction between "phosphoric"

and "superphosphoric" acid, and that having made such a distinction, he wished to make it clear that his process was designed to utilize phosphoric acid. Since that is the case, defendants infringe the '808 patent only if they too use phosphoric acid.

How is "superphosphoric" acid to be defined? The evidence on the point is conflicting in this case. The Court is not prepared to delve into all of the technical aspects of the question. It does appear, however, that those knowledgeable in the art, including the inventor, are in general agreement that superphosphoric acid is distinguished by the fact that it has "substantial" amounts of polyphosphate. The evidence is that Kearns regarded an ammonium polyphosphate level of 20% and above to be required in order for an acid to fit into the superphosphoric category.[15] Testimony at trial, presented by both sides, emphasized that the presence of polyphosphates is necessary in order for an acid to qualify as superphosphoric.[16] Evidence adduced by plaintiff indicates that the acid used by defendants had a polyphosphate content of above 20%,[17] and plaintiff refers to the polyphosphate level of defendants' acid as being in the area of 15%–20%.[18]

The starting acid used by defendants therefore appears to fit the "superphosphoric" definition, at least as to polyphosphate content. What of the $P_2O_5$ level of the acid? Looking to the Kearns patent, once again, we find that superphosphoric acid is defined as having a $P_2O_5$ content of "about 70%."[19] The evidence as to the meaning of the term "about 70%" is naturally conflicting, and the parties argued endlessly about the precise definition of the phrase. We prefer to take a common sense approach.

10. Plaintiff's Exhibit 1, Col. 2, ll. 42–57 (emphasis supplied).

11. *Id.,* Col. 3, ll. 13–16 (emphasis supplied).

12. *Id.,* Col. 1, ll. 13–14 (emphasis supplied).

13. *Id.,* Col. 3, ll. 9–12 (emphasis supplied).

14. *Id.,* Col. 8, ll. 15–18 (emphasis supplied).

15. Defendants' Exhibit F; Plaintiff's Exhibit 1, Col. 3, ll. 25–27.

16. Testimony of Raymond Waters, Tr. p. 77, ll. 17–18; Testimony of W. E. Rushton, Tr. p. 382, ll. 19–24.

17. Plaintiff's Exhibit 25.

18. Plaintiff's Post–Trial Reply Brief, p. 9.

19. Plaintiff's Exhibit 1, Col. 2, ll. 46–48.

Plaintiff has cited defendants' acid as having a $P_2O_5$ content of 68%.[20] This is documented by defendants' company records, introduced in evidence by plaintiff.[21] We conclude that an acid having a $P_2O_5$ content in the area of 68% would be generally recognized in the community as having a $P_2O_5$ content of "about 70%." Defendants' acid thus falls within the definition of "superphosphoric" acid, both as to its phosphate level and as to its $P_2O_5$ content. As defendants' acid is therefore superphosphoric, it may not infringe the '808 patent, which calls for the use of phosphoric acid.

## B. *RESIDENCE TIME*

The question of "residence time"–how that time is to be determined, and whether the residence time of defendants' process is the same as or greater than that found in the Kearns patent–is the most hotly contested issue in this case. We have already discussed the matter at some length in finding the '808 patent invalid. Plaintiff contends that its definition of residence time measures the time required to adequately mix the reactants, and says that such time is best measured by examining the residence time of the steam produced by the reaction, assuming that the melt of ammonium phosphate is entrained in and traveling at the same speed as the steam. Defendants stand on the proposition that residence time is in fact the residence time of the melt alone. Plaintiff violently opposes defendants' position, and has spent an inordinate amount of time attempting to refute it. Several important points, however, stand out on the question of residence time, apart from arguments advanced by the parties. Plaintiff contends, for example, that there is nothing in the Kearns patent which teaches that residence time is to be measured in terms of the melt. As we have pointed out, however, there is also nothing in the Kearns patent, or in any of the other patents before the Court, which "teaches" that residence time is to be measured by the residence time of the steam involved. One looks in vain for such a formula. Secondly, although plaintiff now maintains that its

definition of residence time has always been based on the time required for adequate mixing of the reactants, and that the residence period of the steam is simply the best measure of that time, such a distinction, if there be any, has not been made apparent to the Court. Indeed, when the question of residence time was the subject of inquiry, plaintiff's counsel persistently developed the theme that its method of measurement was correct, since according to its theory the melt was entrained with the steam and traveled at the same speed. Such an argument is only directed at refuting a contrary position set forth by defendants; it does nothing to establish that residence time is actually to be measured in terms of the time necessary to adequately mix the reactants. Finally, plaintiff has been sharply critical of certain tests made by defendants' expert witness, Dr. Busot. Plaintiff has declared the tests to be inaccurate and unscientific. The tests, conducted by Dr. Busot in order to determine the residence time of the melt in defendants' apparatus, showed generally that the residence time of defendants' process is longer than one second. But, although plaintiff has criticized the method, assumptions and conclusions of Dr. Busot, the fact remains that defendants are the only parties in this suit to have conducted any tests relevant to the issues in the case. To the knowledge of the Court, plaintiff conducted no such tests of either defendants' or its own equipment. Plaintiff's only evidence on the question of residence time consisted of calculations made by one of its experts, without the benefit of any actual experimentation.

The Court has previously concluded, on the issue of the validity of the Kearns patent, that more than one viable method of measuring residence time is available here. We believe that the same conclusion is applicable to the question of infringement as well. Defendants' process does not infringe the '808 patent, because the residence time of the ammonium phosphate melt is more than one second. Defendants' experimental evidence as to residence time indeed may

---

**20.** Plaintiff's Post–Trial Reply Brief, p. 9.

**21.** Plaintiff's Exhibit 26.

have been scientifically weak; plaintiff, however, offered no experimental evidence to refute that of defendants, and the Court will not discount that evidence solely on the basis of the arguments of plaintiff's counsel or the testimony of plaintiff's expert witness, grounded as that testimony was upon abstract calculation and theory.

### C. FILE WRAPPER ESTOPPEL

The doctrine of file wrapper estoppel may be stated in the following manner:

"... the essence of the doctrine is that a patentee may not expand his allowed claims by interpretation to embrace features which he disclaimed in order to overcome objections by the Patent Office on the basis of prior art disclosures...."

McCullough Tool Co. v. Well Surveys, Inc., 343 F.2d 381, 403 (10th Cir. 1965).

File wrapper estoppel may arise from an applicant's conduct, including arguments made to the Patent Office, during the prosecution of his patent application. CMI Corp. v. Metropolitan Enterprises, Inc., 534 F.2d 874 (10th Cir. 1976). The doctrine comes into play in any situation in which the patentee, as a consequence of the fact that the accused process does not read directly upon the claims of the patent in suit, is forced to rely on the doctrine of equivalents, an accused process may infringe in spite of the fact that it does not read literally upon the patent in suit, if it can be shown that it does the same work as the patented invention in substantially the same way and accomplishes the same result.

Plaintiff's position on the question of file wrapper estoppel is that the doctrine has no application in this case. Plaintiff holds firmly to the argument that:

"... If accused matter falls clearly within the claim, infringement is made out and that is the end of it." Graver Mfg. Co. v. Linde Co., 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950).

According to plaintiff, if infringement is clearly made out, there can be no file wrapper estoppel. King–Seeley Thermos Co. v.

Refrigerated Dispensers, Inc., 354 F.2d 533, 541 (10th Cir. 1965). The problem with this line of argument, of course, is that the Court has determined that in this case infringement is not clearly made out. The doctrine of file wrapper estoppel therefore does apply here.

Defendants raised the issue of file wrapper estoppel in connection with the argument that their process does not infringe the '808 patent, in view of the fact that the Kearns patent uses phosphoric acid, while defendants' process utilizes superphosphoric acid. Defendants point out that Kearns' original claims were rejected as "unpatentable" over the Hignett Patent, No. 3,171,-733.[22] Kearns' original claims called for the use of phosphoric acid.[23] In response to the rejection of his claims, Kearns argued to the Patent Office that:

"... It is respectfully pointed out that the Hignett process calls for superphosphoric acid, I.E., a $P_2O_5$ content of 74–85% as the phosphate source. On the other hand, applicant's starting reactant is wet process phosphoric acid having a $P_2O_5$ content of between about 55–65% ... However, the process now under consideration calls for an acid having essentially no polyphosphates ..." [24]

The reaction of the patent examiner to this argument was to begin to compare the claims of Kearns to those found in the Getsinger patent, a patent calling only for the use of simple phosphoric acid.[25] The point of defendants' argument is that, in view of Kearns' representations to the Patent Office regarding the use of phosphoric acid in his patent, plaintiff is estopped to contend that defendants' process infringes the Kearns patent, since to do so would necessarily mean that the claims of the patent would be expanded to include the use of superphosphoric acid. The rule of law supports defendants' position:

"A patentee having argued a narrow construction for his claims before the United States Patent and Trademark Of-

---

22. Defendants' Exhibit R–21A, Cols. 3 and 6.

23. Id., Col. 1.

24. Id., Col. 3.

25. Defendants' Exhibit R–21B, Cols. 1 and 4.

fice should be precluded from arguing a broader construction for the purposes of infringement." *Coleco Industries v. United States International Trade Commission,* 573 F.2d 1247, 1248 (C.C.P.A. 1978). [Emphasis supplied.]

*See also, CMI Corp. v. Metropolitan Enterprises, Inc., supra.*

The effect of the doctrine of file wrapper estoppel in this case, then, is to provide an independent ground for a finding of no infringement by defendants' process, in view of our previous determination that defendants' process utilizes superphosphoric acid.

### III. *CONCLUSIONS*

The testimony and evidence adduced in this case have convinced this Court not only that the Kearns patent is invalid, but also that even if it were valid there would be no infringement of it by defendants' process. The Court is aware of the fact that in rendering this opinion, it places itself in conflict, in some respects, with the decision of the Honorable Judge Morey L. Sear in *Swift Chemical Co. v. Usamex Fertilizers, Inc.,* 197 U.S.P.Q. 10 (E.D.La.1977). The principle area of distinction between the two cases is that in *Usamex* Judge Sear found the '808 patent to be valid and enforceable. The Court wishes to make clear that it has the utmost respect for Judge Sear and his opinion in the *Usamex* case. At the same time, however, it is readily apparent that there are fundamental differences between this and the *Usamex* case. The existence of these basic differences, coupled with the fact that under the circumstances we are not bound to the *Usamex* decision by the principles of *res judicata* or *stare decisis,* necessarily lead the Court to a decision which apparently contradicts *Usamex.*

In *Usamex,* apart from questions relating to the validity of the Kearns patent, the only pertinent issues before the Court were the issue of infringement and the question of whether the parent corporation, Fertilizantes Fosfatados Mexicanos, S.A., could be held directly liable to Swift as an infringer. In this action, no question has been raised with respect to parent corporation liability.

On the subject of infringement, the Court in *Usamex* was concerned solely with deciding whether the "tee reactor" used by the defendants constituted a "jet reactor," thereby infringing upon the claims of the Kearns patent. In this action, as we have seen, the main areas of contention with regard to the matter of infringement are the definition of superphosphoric acid and the determination of residence time. The important superphosphoric acid issue was not before Judge Sear in any fashion. And while Judge Sear did consider the problem of residence time, the circumstances in which he did so were much different than those present in this case.

Turning to the subject of the validity of the Kearns patent, it appears that in *Usamex* the defendants pursued two lines of attack. The first involved a charge that the patent in suit was invalid due to the fact that the claims contained therein were not stated with sufficient particularity. Such an issue did not arise in this action. The defendants in *Usamex* also attacked the validity of the '808 patent on the ground that the invention would have been obvious to anyone skilled in the art. Addressing this problem, Judge Sear pointed out that Swift made claims of non-obviousness in only two areas–the prescribed temperature range and residence time. In the present action, there is no issue regarding the temperature range of the reaction, because it is clear that defendants' process does operate at the same general temperatures as those set forth in the '808 patent. With regard to residence time, the gist of Judge Sear's opinion was that the Kearns patent could not have been obvious on that ground, since it was the first patent in the area to emphasize the importance of a short residence time to the success of the process. Since this was the thrust of the *Usamex* opinion on this point, there was evidently no evidence introduced on the question of whether representatives of the prior art might have been characterized by a residence time equal to or shorter than that prescribed by the Kearns patent. There was also no discussion in *Usamex* of the fact that more than one method for determining residence time does exist.

In short, as between the Court's opinion in this action and that of Judge Sear in *Usamex*, there are really only two points of comparison. In both cases, the relative shapes of the reactors were considered. In that respect, Judge Sear's opinion is supportive of the Court's decision here, since Judge Sear held that the type of reactor applicable to the Kearns process could not be strictly limited by the description found in the patent. *Usamex, supra, 197 U.S.P.Q. at p. 18.* This Court made the same point in demonstrating that the prior art might not be distinguished from the Kearns patent simply on the basis of the types of reactors described in the prior art. The only other issue addressed in both cases was that of residence time. The Court believes that a different result on this point was reached here simply because the question was fully broached before this Court, as it was not in *Usamex*.

IV. *FINDINGS OF FACT* and *CONCLUSIONS OF LAW*

A. *FINDINGS OF FACT*

1. This Court has jurisdiction over this action for infringement of a United States Patent, under 28 U.S.C. § 1338(a), and venue is proper under 28 U.S.C. § 1400(a).

2. Plaintiff Swift Agricultural Chemicals Corporation (now known as Estech General Chemicals Corporation) is a Delaware corporation having its principal place of business in Chicago, Illinois.

3. Defendant Farmland Industries, Inc. is a Kansas corporation having its principal place of business in Kansas City, Missouri.

4. Defendant Farmers Chemical Company, a wholly owned subsidiary of Farmland, is a Kansas corporation having its principal place of business in Joplin, Missouri.

5. The Young patent, No. 3,044,851, discloses a process that is materially identical to that described in the Kearns patent in suit, No. 3,464,808, in that it discloses a continuous reaction between phosphoric acid and ammonia, in a tubular reactor, at a temperature of between 450° F and 650° F, with a residence time of less than one second, involving simultaneous neutralization and molecular dehydration, and pro-

ducing an ammonium polyphosphate fertilizer bearing self–sequestering properties.

6. The Getsinger patent, No. 3,382,059, discloses a process that is materially identical to that described in the Kearns patent in suit, No. 3,464,808, in that it discloses a continuous reaction between phosphoric acid and ammonia, in a tubular reactor, at a temperature of between 450° F and 650° F, with a residence time of less than one second, involving simultaneous neutralization and molecular dehydration, and producing an ammonium polyphosphate fertilizer bearing self–sequestering properties.

7. The application of Lutz and Rubio, Serial No. 352,764, discloses a process that is materially identical to that described in the Kearns patent in suit, No. 3,464,808, in that it discloses a continuous reaction between phosphoric acid and ammonia, in a tubular reactor, at a temperature of between 450° F and 650° F, with a residence time of less than one second, involving simultaneous neutralization and molecular dehydration, and producing an ammonium polyphosphate fertilizer bearing self–sequestering properties.

8. The prior art in this case consists of patents, applications and other work. These matters demonstrate the level of ordinary skill in the art at all times relevant to the development and filing of the Kearns application. They indicate that the skilled artisan in the field, prior to the filing of the Kearns application, had sufficient knowledge of his art to enable him to combine all of the limitations claimed in the '808 patent.

9. The Kearns patent in suit disclaims the use of superphosphoric acid as a starting acid, and makes clear that said starting acid is composed of phosphoric acid. One of the advantages claimed for the '808 patent is stated to be the elimination of the expensive step of making superphosphoric acid in the production of liquid fertilizer.

10. The Kearns patent in suit claims a residence time for the reactants in the reactor of less than one second. The patent does not disclose how its contact period or residence time of less than one second is to be measured.

11. As a result of statements in the patent specification and representations made to the Patent Office during the prosecution of the application, as reflected in the file history, plaintiff is estopped to assert that the claims of the Kearns patent are broad enough to include the use of superphosphoric acid.

12. The method by which plaintiff measures the residence time of its process is based on the assumption that the ammonium phosphate melt is entrained in and moving at the same speed as the steam generated by the chemical reaction inside the reactor. That method was derived solely from mathematical calculations, and is grounded in abstract scientific theory. Plaintiff conducted no physical tests to demonstrate the veracity of its method for calculating residence time.

13. The method by which defendants measure the residence time of the reactants in their process is based on the notion that the products of the reaction move at different speeds relative to each other. Defendants have conducted actual physical tests concerning the residence time of their reactor. Those tests indicate that the residence time of defendants' process is more than one second.

14. No evidence was introduced in this case which would show that the method of measuring residence time used by defendants in connection with their own reactor was inappropriate to the reaction in question, or that such method was unavailable to engineers, chemists, physicists, patent attorneys and others skilled in the art at the time of or prior to the filing of the Kearns application.

15. Defendants utilized a definition of residence time developed by plaintiff to measure the residence time of certain other analogous processes for the manufacture of ammonium phosphate fertilizer. There was no showing that plaintiff's method for measuring residence time was inappropriate for such a purpose, or that such method was unavailable to engineers, chemists, physicists, patent attorneys and others skilled in the art at the time of the development of the analogous prior art processes.

16. Defendants' use of superphosphoric acid is outside the scope of the claims found in the Kearns patent.

17. The residence time of the defendants' process, since it exceeds one second in duration, is beyond the scope of the claims of the Kearns patent.

### B. CONCLUSIONS OF LAW

1. Plaintiff is estopped to assert that the claims of U.S. Patent No. 3,464,808 are broad enough to encompass the use of superphosphoric acid, owing to representations made to the Patent Office during the prosecution of the application.

2. By reason of anticipation by the prior art, pursuant to 35 U.S.C. § 102, all of the claims of U.S. Patent No. 3,464,808 are invalid.

3. By reason of obviousness, pursuant to 35 U.S.C. § 103, all of the claims of U.S. Patent No. 3,464,808 are invalid.

4. If U.S. Patent No. 3,464,808 was a valid patent, it is not infringed by defendants' commercial processes, in view of the fact that the residence time of the chemical reaction in defendants' commercial processes is more than one second in duration, and therefore exceeds the residence time claimed for U.S. Patent No. 3,464,808.

5. If U.S. Patent No. 3,464,808 was a valid patent, it is not infringed by defendants' commercial processes, in view of the fact that defendants' commercial processes use superphosphoric acid, whereas U.S. Patent No. 3,464,808 is limited to the use of phosphoric acid.

Counsel for defendants are directed to prepare, circulate and submit to the Court a Journal Entry to reflect this Order.

IT IS SO ORDERED.